Foster brought this securities action in the United States District Court for the Southern District of Alabama after he lost a $40,000 investment. After a jury verdict in his favor, the case was appealed to the United States Court of Appeals for the Eleventh Circuit. 759 F.2d 838 (1985). That court held that Jesup Lamont was not a "seller" under § 12 (2) of the Securities Act of 1933, 15 U.S.C.A. § 77l (2), and that its participation as underwriter was not a substantial factor in the buy-sell transaction. Therefore, it held that there was no liability to Foster under the federal securities law. It recognized, however, that the law of this state is different and, therefore, certified these questions to this Court. Because the factual background, both substantive and procedural, is succinctly set out by the court in its opinion, we restate it here:*
 "Facts
"Foster, plaintiff below, invested in a Texas limited partnership in December, 1980 (Texas Partners `80, Ltd., hereafter `Texas Partners'). Texas Partners' ostensible business purpose was to develop oil and gas wells. In fact, no substantial drilling operations were undertaken on behalf of the partnership, and Foster lost the amount he invested.
"Foster bought his interest from Minnick, sole shareholder and president of Minnick Resources Management, Inc., which was the general partner in Texas Partners.[2] The only party involved with Texas Partners that defended before the district court and the only party opposing Foster *Page 1202 
before this court is Jesup Lamont Securities Co. (`Jesup 
Lamont'), a New York securities dealer whose name appeared on the Texas Partners offering document.
"Jesup Lamont first became involved in the offering in June of 1980 when its president, Curd, and its vice-president, Thors, met with Minnick to discuss the firm's participation. Minnick and Jesup Lamont subsequently entered into an agency agreement whereby the firm promised to use its `best efforts' to sell interests in Texas Partners. Jesup Lamont was to receive a ten percent commission for interests it sold, and a two percent commission for interests sold by Minnick. Jesup 
Lamont was not required by the agreement to sell any interests, but only to use its best efforts in that regard.
"Following the initial meeting with Minnick, Curd inquired of Minnick's former employers and of his banker about Minnick's standing in the investment community. These references were favorable, and reported that Minnick `had a reputation of being successful in oil and gas.' 4 Rec. at 347. Jesup Lamont did not investigate other particulars about Minnick, such as how he had fared in specific oil and gas deals or his standing with trade creditors. Jesup Lamont also did not investigate the particulars of the Texas Partners undertaking, such as the status of the partnership's leases or the financial feasibility of the planned drilling operations.
"The Texas Partners venture went forward and an offering memorandum was prepared for use in the sale of interests in the partnership. Minnick testified by deposition that he drafted the offering memorandum, but that it was reviewed by a lawyer at Shea Gould, a New York law firm that represented Minnick in the proposed offering. Shea Gould was also general counsel to Jesup Lamont. Jesup Lamont had no role in the drafting or printing of the offering memorandum, the cost of which was borne by Minnick. Three hundred copies were printed and delivered to Minnick, who sent thirty copies to Jesup Lamont.
"The offering memorandum comprises sixty pages of text and nine exhibits. The cover of the memorandum displays the limited partnership's name at the top and Jesup Lamont's name, address, and phone number at the bottom, with the notation that the firm is a member of the New York Stock Exchange.[3] The same general information about Jesup Lamont is presented on the first inside page and a legend appears in two places early in the document stating that `These Limited Partnership Interests are being primarily distributed through Jesup Lamont Securities Co., Inc.' Pl. Ex. 1. In the text of the offering memorandum is the information that Texas Partners and Jesup 
Lamont had entered into a best efforts selling arrangement, and that `In addition, other persons may receive commissions for selling Interests, including Minnick Resources Management, Inc.' Id. at 4. The offering memorandum is dated July 30, 1980.
"Jesup Lamont and Minnick rescinded their sales agency agreement shortly after this date.[4] In his deposition, Minnick testified that he had been unhappy with Jesup Lamont's performance. At trial, Curd testified that Jesup Lamont had decided `the item was basically not marketable.' 4 Rec. at 348. Although the principals agreed to rescind the best efforts agreement, they disagreed about who should pay for the offering documents. Minnick wanted Jesup Lamont to pay the printing costs because the firm's lack of success had resulted in rescission of the agreement. Jesup Lamont took the position that it had no responsibility to pay because the agreement only required `best efforts,' which the firm felt it had given. There is no dispute in the record that Minnick told Curd he was going to remove Jesup Lamont's name from the document. Minnick testified he attempted to do so for several offering documents by using scissors to cut out at least some of the references to Jesup Lamont. Jesup Lamont did not attempt to have Minnick surrender to the firm the offering documents in his possession. *Page 1203 
"Foster was first introduced to Texas Partners by his accountant, Jordan, who had met Minnick in May of 1980. Jordan testified by deposition that he traveled to New York in November of 1980 on business not related to Texas Partners, but which involved Jesup Lamont. Jordan took advantage of this opportunity to question Curd about Minnick's prior activities. Curd reassured him about Minnick even though, unknown to Jordan, Jesup Lamont had already withdrawn from the Texas Partners offering. Jordan testified that at the November meeting, Curd told him `We are involved in this offering document and we know of nothing that would effect [sic] our relationship with Mr. Minnick.' 3 Rec. at 195. At trial, Curd denied the occurrence of the meeting at which this statement allegedly was made.
"Minnick and Foster were brought together for the first time by Jordan at a meeting attended by the three in Jordan's Alabama office in late December of 1980. The meeting lasted for one to two hours and focused on Foster's possible purchase of an interest in Texas Partners. Foster questioned Minnick about his background and about the particulars of the undertaking. Minnick made representations about the amount of money that had already been raised by Texas Partners, and told Foster that the money was to be used in drilling numerous wells. Foster was given a copy of the offering memorandum, which bore Jesup 
Lamont's name. He testified he studied the document after the meeting and relied on it in eventually deciding to buy one-half of an interest in Texas Partners. Foster did not communicate directly with anyone at Jesup Lamont before he invested in Texas Partners.
"The specific representations in the offering memorandum Foster said he relied on that later proved false were: (1) that Jesup Lamont was involved in the offering; (2) that the proceeds of the offering would be used by Texas Partners in development drilling for oil and gas; (3) that the general partner, Minnick Resources Management, Inc., would contribute five percent of the drilling costs; and (4) that investments would be refunded if a minimum amount were not raised.
"Jordan's association with Minnick continued after Foster's purchase. Jordan learned from work he did for the drilling company, Pyron Exploration and Drilling Corp., that Texas Partners had not raised the required minimum in investments. Further, Jordan discovered that the money raised by Texas Partners had not been applied to development drilling as promised. When Jordan notified Foster of these facts, Foster called Minnick, who assured him that the money he had invested would be refunded. When Minnick failed to refund his money, Foster filed suit in federal district court claiming violations of both state and federal securities laws.
 "Proceedings Before the District Court
"Foster presented four counts in his first complaint. In Count I, he claimed damages for the sale of an unregistered security, which is made unlawful by § 5 of the Securities Act of 1933, and actionable by § 12 (1) of that Act. The district court dismissed this federal registration claim as time barred and that decision has not been appealed. Count I also stated a registration claim under Alabama law. We discuss this latter claim in the section of this opinion addressed to certification of controlling state law questions.
"In Count II, Foster claimed damages for the sale of a security by means of false written or oral communications in violation of §§ 17 and 12 (2) of the 1933 Act and in violation of various Alabama code sections. The district court dismissed Foster's federal § 17 claim on the ground that the section does not afford a private right of action. That decision has not been appealed. Jesup Lamont's liability founded on § 12 (2) of the 1933 Act is the main subject of this opinion. The state law claims raised in Count II are discussed below, where we certify questions to the Alabama Supreme Court.
"In Count III, Foster alleged violation of § 10 (b) of the Exchange Act of 1934 and of *Page 1204 
Rule 10b-5 promulgated by the Securities and Exchange Commission (`SEC'). As construed by the courts, these provisions provide a cause of action for fraudulent practices undertaken in connection with the purchase or sale of a security. Finally, in Count IV, Foster sought compensatory and punitive damages for common law deceit. Foster learned after he filed his complaint that Jesup Lamont and Minnick had rescinded their sales agency agreement before he invested in Texas Partners. He subsequently amended his complaint to exclude Jesup Lamont as a defendant with respect to Counts III and IV relating to fraud under § 10 (b) of the Exchange Act and for common law deceit. Thus, there are no federal or state claims against Jesup Lamont under Counts III or IV.
"The only federal claim, the § 12 (2) claim in Count II, and the several state law claims in Counts I and II were tried before a jury in the United States District Court for the Southern District of Alabama. Foster testified in his own behalf and introduced into evidence the pretrial depositions of Jordan and Minnick. Foster also presented an expert witness, Krebs, a former Alabama securities commissioner who testified about the customary duty of underwriters to control distribution of offering documents in private offerings. Jesup Lamont presented two witnesses in its own behalf at trial — Curd, its president, and Thors, its vice president and syndicate manager.
"The case was submitted to the jury on special interrogatories, all of which were answered unfavorably to Jesup Lamont.[10] The district court entered judgment against Jesup Lamont based on the jury's answers, and Jesup Lamont subsequently appealed from the judgment and from denial of its various post-trial motions.
". . . .
 "Certification of Determinative State Law Questions
"We turn therefore to the various state law claims against Jesup Lamont since we have concluded that the firm is not subject to liability as a § 12 (2) seller under federal law. As noted, Counts I and II remained against Jesup Lamont in Foster's amended complaint, and Foster alleged violations of Alabama law in each of these counts.
"In Count I, Foster claimed damages for the sale of an unregistered security, which is made unlawful by § 8-6-4 of the Alabama Code,[20] and which is made actionable by § 8-6-19[21]
(`Section 19' or `§ 19'). Section 19 extends liability to one who `sells or offers to sell' a security, and also to `every broker-dealer or agent who materially aids in the sale.' Ala. Code § 8-6-19 (a), (b) ([Michie] 1984). The district court instructed the jury that `materially aided' is equivalent to `substantial factor.' 4 Rec. at 489. At trial, Foster objected to this instruction. Because the jury returned a verdict in favor of Foster, that objection is moot. However, with respect to the issue of exactly how much evidence is legally sufficient to support the jury verdict, Foster contends on appeal that less participation is needed to meet Alabama's `materially aided' standard than is needed to show that a defendant was a `substantial factor' in a sale and thus a `seller' under federal law. Apparently, Foster bases his argument on the language of § 19, which refers to `the non-seller who is [also] liable.'[22] Unlike federal § 12, which limits liability to sellers, the Alabama provision imposes liability on a broader range of participants in securities transactions. In this respect, § 19 is similar to § 11 of the 1933 Act, which also lists specific participants who are subject to liability.
"We have found no Alabama case discussing the level of participation required for secondary liability under § 19. Because this point has become determinative in the present case, we certify the following question to the Alabama Supreme Court for instruction pursuant to Ala.R.App.P. 18:
 "Question One: Has a securities firm `materially aided' an unlawful sale of a security within the meaning of Alabama *Page 1205 
Code § 8-6-19 (b) under the following circumstances:
 "(a) The firm's name was displayed prominently on an offering document used in connection with the sale, and the firm was presented in the document as the issue's primary best efforts underwriter, even though the firm had withdrawn from the offering;
 "(b) The buyer relied on the firm's participation in the offering in reaching his decision to purchase an interest;
 "(c) There is substantial evidence in the record from which we must infer that the jury found that an underwriter customarily is responsible for controlling distribution of the offering documents in a private offering;
 "(d) The firm's president told the buyer's accountant that the firm was `involved' in the offering document after the firm had rescinded its agreement to help sell the security;
 "(e) The buyer did not directly communicate with the brokerage firm in reaching his decision to invest;
 "(f) The buyer met with the promoter of the issue to discuss the promoter's background and to discuss various business aspects of the venture before deciding to invest;
 "(g) The buyer delivered his check to the promoter in exchange for the security.
"Count II of Foster's complaint contains two state law claims for damages based on the sale of a security by means of false written or oral communications. The first of these is grounded on Ala. Code § 8-6-19 (a)(2). We believe that the disposition of this Alabama claim would be determined by the same question we have certified above with respect to Foster's state law registration claim. The viability of each of these claims depends on the Alabama Supreme Court's application of the `materially aided' standard to the facts of this case.
"Foster's other basis under state law for his Count II false communication claim is Ala. Code § 8-6-17.[24] The district court treated this section as affording a private right of action and concluded on the basis of an analogy to federal Rule 10b-5 actions that scienter must be shown to support recovery under the section. Jesup Lamont contend on appeal that the section does not afford a private right of action, while Foster appeals contending that an action under the section does not require scienter. We have found no Alabama case addressing either of these questions. Because they may determine Foster's right to recover if he is not successful with his other claims under Alabama law, we certify the following additional questions to the Alabama Supreme Court for instruction under Ala.R.App.P. 18:
 "Question Two: Does Alabama Code § 8-6-17
afford a private right of action?
 "Question Three: If a private cause of action is available under Alabama Code § 8-6-17: (a) is proof of scienter necessary to maintain the action? and (b) would severe recklessness meet the scienter requirement?[25]
"The particular phrasing used in the certified questions is not to restrict the Alabama Supreme Court's consideration of the problems involved and the issues as the Alabama Supreme Court perceives them to be in its analysis of the record certified in this case." *Page 1206 
[EDITORS' NOTE: EXHIBIT A IS ELECTRONICALLY NON-TRANSFERRABLE.]
We answer the first question as follows: A jury could conclude that a securities firm "materially aided" an unlawful sale of a security within the meaning of § 8-6-19 (b) under the circumstances set out in the certified question. Because we answer this question in the affirmative, it is unnecessary, as Judge Anderson anticipated, to reach the remaining two questions.
Section 8-6-19, Ala. Code 1975, is patterned in part on § 12 (2) of the Securities Act of 1933, particularly subsection (a). Subsection (b), however, is, as the Court of *Page 1207 
Appeals noted, substantially different and, as Foster argues, considerably broader than § 12 of the Securities Act of 1933. Subsection (b) imposes liability on a group of participants in securities transactions beyond the seller.
Subsection (b) reads as follows:
 "(b) Every person who directly or indirectly controls a seller liable under subsection (a) of this section, every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."
In expanding liability to groups of persons beyond the seller of the security, the Alabama act goes beyond the federal act. As one distinguished writer has observed, referring to subsection 19 (b):
 "A third category under the Alabama Act that goes beyond the comparable federal provision enumerates persons who cannot properly be considered control persons, such as employees of the seller or broker-dealers or agents who may have participated in the sale. The latter persons are included on the basis of what may be considered an express statutory aiding and abetting theory, since the employee, broker-dealer or agent must have `materially aid[ed] in the sale.' Therefore, to hold a person liable a plaintiff need not show any active connivance or participation by the alleged control person, except in the case of an employee, broker-dealer, or agent; all he need do is establish the defendant's status, either as a controlling person, a partner, or an occupant of some other statutory classification [as here a broker-dealer who materially aids in the sale], plus the fact of the seller's liability. The defendant then is left with only one defense, as he is under the federal statute. He may show that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the seller's liability is alleged to exist." (Emphasis in original.)
J. Michael Rediker, Alabama's "Blue Sky Law" — Its. DubiousHistory and Its Current Renaissance, 23 Ala.L.Rev. 667, 714 (1971).
The Circuit Court of Appeals correctly notes that there are no Alabama cases which discuss the level of participation required to impose secondary liability under § 8-6-19 (b). It is interesting that while this section is based almost verbatim on § 410- (b) of the Uniform Securities Act, adopted in Alabama in 1959, and which has been adopted in many other states, there are few cases from other jurisdictions which give guidance. Oregon's statute is similar, but not identical. Or.Rev.Stat. §59.115 (3) provides that "every person who participates or materially aids in the sale" is liable. A federal district court in a diversity case held that the statute reached a non-seller who was shown to have actively participated and materially aided the sale by his activities. Black Co. v.Nova-Tech, Inc., 333 F. Supp. 468 (D.Or. 1971).
Jesup Lamont's argument to the effect that its activities must be a "substantial factor" in the sale to Foster is misplaced. It is true that the Eleventh Circuit has held that one may be liable under § 12 of the Securities Act as a seller if his activities are a substantial factor in the sale. It is also true that the Eleventh Circuit here held as a matter of law that Jesup Lamont's activities were not a substantial factor in the sale to Foster. That, however, casts no light on the question of whether Jesup Lamont materially aided the sale within the meaning of the Alabama act.
Our response to the first question is affirmative. Under the facts of this case, a jury was justified in finding that Jesup *Page 1208 
Lamont materially aided the sale to Foster, and it is, therefore, secondarily liable under § 8-6-19 (b), Ala. Code 1975.
QUESTION ANSWERED.
TORBERT, C.J., and FAULKNER, JONES, ALMON, BEATTY, ADAMS**
and HOUSTON, JJ., concur.
MADDOX, J., not sitting.
* Certain footnotes have been omitted from the quoted material. Those not omitted are set out in an appendix to this opinion.
** Although Justice Adams did not sit at oral argument, he has listened to the tapes of oral argument and studied the record and briefs.
 APPENDIX Footnotes to the Opinion of the Eleventh Circuit Court of Appeals
[2] "The actual drilling operations contemplated were to have been undertaken by Pyron Exploration and Drilling Corp., another Texas entity in which Minnick was involved. Each of the four — Texas Partners '80, Ltd; Minnick; Minnick Resources Management, Inc.; and Pyron Exploration and Drilling Corp. — were named as defendants in Foster's securities action in the district court. None of the four filed responsive pleadings, and default judgments were entered against them. All four filed notices of appeal, but their appeals were subsequently dismissed for want of prosecution.
[3] "See Exhibit A to this opinion. [That exhibit is set out following the Court of Appeals' opinion as quoted in this Alabama Supreme Court opinion.]
[4] "The record does not fix the date of rescission precisely, but Curd testified that the agreement was to expire on August 30, which was `right around this time [i.e., the time of rescission].' 4 Rec. at 349.
[10] "As relevant here, the jury found that Jesup Lamont had materially aided in the sale of unregistered securities to Foster, and that Jesup Lamont was a substantial factor in the sale of a security to Foster. 4 Rec. at 513-14.
[20] "Ala. Code § 8-6-4 (Michie 1984).
[21] "Id. at § 8-6-19.
[22] "Alabama Code § 8-6-19 (b), in its entirety, reads:
"`(b) Every person who directly or indirectly controls a seller liable under subsection (a) of this section, every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.'
[24] "Ala. Code § 8-6-17 (Michie 1984). This section too may have analogues in federal law. An Alabama court has observed in a criminal case that § 8-6-17 is `virtually identical' with the language of Rule 10b-5. Buffo v. State, 415 So.2d 1158, 1162
(Ala. 1982). We pause only to note that the Alabama section is also similar to § 17 (a) of the 1933 Act, 15 U.S.C.A. § 77q (a) (West 1981), which is perhaps not surprising given the similarity between the two federal provisions.
[25] "Special interrogatory number ten asked `Has the Plaintiff proved by a preponderance of the evidence that Jesup Lamont engaged knowingly in misconduct or acted with severe recklessness?' The jury answered `Yes.' See 4 Rec. at 515, line 17. We note that if Foster's recovery is supported under the `materially aided' standard of Ala. Code § 8-6-19, the Supreme Court of Alabama may find it unnecessary to reach questions Two and Three concerning Ala. Code § 8-6-17. Similarly, the Alabama Supreme Court may find it unnecessary to decide whether Ala. Code § 8-6-17 requires scienter if the court determines that the special interrogatories established sufficient scienter assuming arguendo that scienter is required. See 4 *Page 1209 
Rec. at 515, lines 17-20. The Supreme Court of the United States has reserved decision on whether recklessness is sufficient to establish scienter. See Ernst Ernst v.Hochfelder, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381 n. 12,47 L.Ed.2d 668 (1976); Aaron v. SEC, 446 U.S. 680, 686 n. 5,100 S.Ct. 1945, 1950 n. 5, 64 L.Ed.2d 611 (1980). Some circuit courts of appeal have held that recklessness will support an action under Rule 10b-5. See, e.g., Rolf v. Blyth, EastmanDillon Co., 570 F.2d 38, 44 (2d Cir. 1978)."