No. 91,778

ROGER KLEIN, *Appellant, v.* OPPENHEIMER & Co., Inc., *Appellee.*

(130 P.3d 569)

Opinion filed March 24, 2006.

*Joseph C. Long*, of Norman, Oklahoma, argued the cause, and *Diane A. Nygaard*, of Leawood, and *Susan F. Meagher*, of Leawood, were with him on the briefs for appellant.

*Tracy J. Cowan*, of Thompson Coburn LLP, of St. Louis, Missouri, argued the cause, and *David Wells* and *Karen M. Volkman*, of the same firm, and *Roger N. Walter*, of Morris, Laing, Evans, Brock & Kennedy, of Topeka, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: The principal issue in this case is the liability of a clearing broker for the sale of unregistered securities under the Kansas Securities Act. It is an issue of first impression.

Roger Klein had a brokerage account with L.T. Lawrence. L.T. Lawrence, functioning as an originating or introducing broker, sold unregistered securities through Oppenheimer & Co., Inc. (Oppenheimer), a clearing broker, to Klein. The sale of nonexempt, unregistered securities is prohibited by K.S.A. 17-1255. Klein sued Oppenheimer under K.S.A. 17-1268(a) and (b) of the Kansas Securities Act. (Note: Effective July 1, 2005, the entire Kansas Securities Act was repealed and replaced by the new Kansas Uniform Securities Act, K.S.A. 2005 Supp. 17-12a101 *et seq*. The provisions of that Act are not relevant to this appeal.) On cross-motions for summary judgment, the district court ruled in favor of Oppenheimer. Klein appealed. This court granted Oppenheimer's motion to transfer the appeal from the Court of Appeals. K.S.A. 20-3017.

The issues on appeal are:

1. Is Oppenheimer liable under K.S.A. 17-1268(a) for aiding and abetting L.T. Lawrence in the sale of unregistered securities?

2. Is Oppenheimer liable under K.S.A. 17-1268(b) for "materially aiding" L. T. Lawrence in the sale of unregistered securities?

3. Were the securities at issue exempt from registration?

4. Were the transactions that occurred on and after October 11, 1996, preempted by the National Securities Markets Improvement Act of 1996, 15 U.S.C. § 78a *et seq.* (2000)?

Procedural history. This action originally was filed in 1999 by Klein and his uncle, Daniel Brenner, who died in 2002. L.T. Lawrence is currently or has been in bankruptcy and is no longer a named defendant in this case. Klein and Oppenheimer are the only remaining parties.

This is the second time the case has been before this court. In the first instance, Klein and Brenner appealed from the entry of summary judgment in favor of Oppenheimer on the ground that a clearing broker was not liable for the sale of unregistered securities under New York law. *Brenner v. Oppenheimer & Co.*, 273 Kan. 525, 44 P.3d 364 (2002). Appellants argued that the choice of law provision in Oppenheimer's standard form brokerage agreement was unenforceable and that Kansas law should be applied. Concluding that Kansas law governed, the court reversed and remanded for further proceedings. 273 Kan. at 549.

Governing Kansas statutes. The purpose of the Kansas Securities Act, K.S.A. 17-1252 *et seq.*, "is to place the traffic of promoting and dealing in speculative securities under rigid governmental regulation and control to protect investors, thereby preventing, so far as possible, the sale of fraudulent and worthless speculative securities." *Activator Supply Co. v. Wurth*, 239 Kan. 610, 615, 722 P.2d 1081 (1986). The Act generally accomplishes its purpose by requiring registration of securities, K.S.A. 17-1256, K.S.A. 17-1257, and K.S.A. 17-1258, and prohibiting the sale of unregistered securities, K.S.A. 17-1255. Certain securities and transactions are exempt from the registration requirement. K.S.A. 17-1261 and K.S.A. 17-1262. An action to enforce the Kansas Securities Act may be prosecuted by the Kansas Securities Commissioner under K.S.A. 17-1266, and K.S.A. 17-1268 authorizes a private right of action.

District court decision. Upon remand from the first appeal, the parties filed cross-motions for summary judgment, which were decided entirely in Oppenheimer's favor. The district court first concluded that Oppenheimer could not be liable for the sale of unregistered securities under K.S.A. 17-1268(a) as an aider and

abettor. Second, the district court concluded that, even if there is secondary liability under 17-1268(a) for the sale of unregistered securities, the stipulated facts would not support a finding that Oppenheimer was liable as an aider and abettor. Third, the district court concluded that Oppenheimer was not jointly and severally liable under 17-1268(b) because it did not "materially aid" in the sales of unregistered securities within the meaning of the statute. Fourth, the district court concluded that all of the securities at issue, with the exception of MetroGolf, Inc. (MetroGolf), were exempt under K.S.A. 17-1262(b) from the registration requirements. The district court did not address the question whether the security registration requirements of the Kansas Securities Act were preempted by the National Securities Markets Improvement Act of 1996.

Factual statement. For their cross-motions for summary judgment, the parties filed a Joint Statement of Stipulated Undisputed Facts. The following facts are drawn from the stipulated facts and the district court's decision:

L.T. Lawrence was an introducing broker-dealer registered with the Kansas Department of Securities. Oppenheimer, also a broker-dealer registered with the Kansas Department of Securities, acted as a clearing broker for L.T. Lawrence.

In its memorandum opinion, the district court described the functions of an introducing broker and a clearing broker as follows:

"A buyer opens a brokerage account with a broker, who is the agent of the buyer. When the buyer tells his broker that he wishes to purchase a particular stock, whether it is a solicited or unsolicited purchase, the actual stock purchase happens one of two ways. Larger brokerage houses have a seat on the stock exchange and they buy directly for their clients. Smaller brokerage firms frequently do not have a seat on the exchange, so they cannot make direct purchases for their clients. Instead, they contract with one of the larger houses which does have a seat and the larger broker actually executes the purchase. The larger firm is known as the 'clearing broker.' The smaller firm is known as the 'introducing broker.' "

In 1993, Oppenheimer and L.T. Lawrence entered into a clearing agreement that specified what services and functions Oppenheimer was to provide to L.T. Lawrence. Oppenheimer agreed to provide services such as (a) accepting instructions from L.T.

Lawrence for the creation of customer account records in Oppenheimer's automated data system, (b) preparing and transmitting confirmations of trades and monthly account statements to L.T. Lawrence and/or its customers, and (c) extending and maintaining margin credit to L.T. Lawrence customers, where required. Oppenheimer agreed to hold cash and securities received for the L.T. Lawrence accounts and collect and disburse dividends and interest and process reorganization and voting instructions with respect to securities held in custody. Oppenheimer also agreed to (a) receive and deliver cash and securities from, to, and for the L.T. Lawrence accounts in accordance with instructions from L.T. Lawrence or written instruments from L.T. Lawrence customers and be responsible for transferring securities for L.T. Lawrence accounts as directed by L.T. Lawrence customers, (b) extend and maintain margin credit to L.T. Lawrence customers to the extent transactions for them require the extension of credit but subject to Oppenheimer margin policies and applicable margin regulations, and (c) be responsible for calculating margin requirements and initiating margin calls and for the administration of the rehypothecation and lending of securities in customer accounts. ("Hypothecation" is the pledging of something as security without delivery of title or possession. Black's Law Dictionary 759 [8th ed. 2004]).

The clearing agreement was a fully disclosed agreement, meaning that the accounts were carried in the customers' names with a notation on Oppenheimer books that the account came to Oppenheimer through L.T. Lawrence. Oppenheimer sent confirmation notices, account statements, and margin calls directly to the customers. Form letters sent from Oppenheimer to investors notifying them of a margin call were addressed "Dear Client." Customers were to send all funds directly to Oppenheimer.

L.T. Lawrence was required by the clearing agreement to provide the following disclosure statement to its customers:

"[Oppenheimer] does not control, audit or otherwise supervise the activities of [L.T. Lawrence] or its registered representatives or employees. [Oppenheimer] does not verify information provided by [L.T. Lawrence] regarding your account or transactions processed for your account nor undertake responsibility for re-

viewing the appropriateness of transactions entered by [L.T. Lawrence] on your behalf."

Oppenheimer reserved the right to refuse any transactions entered for a customer account.

Under the clearing agreement, L.T. Lawrence was required to maintain compliance and supervisory procedures adequate to assure the compliance of its registered representatives and employees with all federal and state securities laws. At the time of the transactions at issue, Oppenheimer had a reasonable belief that L.T. Lawrence, its agents, and its employees were maintaining compliance and supervisory procedures that were adequate to assure compliance by L.T. Lawrence's registered representatives and employees with all federal and state securities laws.

Oppenheimer did not solicit, recommend, or offer the sale or purchase of any securities purchased by Klein. Oppenheimer cleared all the trades in Klein's account, but acted in no capacity other than clearing broker for any securities purchased from L.T. Lawrence by Klein.

In his petition, Klein alleged that he bought from L.T. Lawrence and Oppenheimer the following unregistered securities:

20,000 shares International Nursing Services, Inc.

109,400 shares Ecotyre Technologies, Inc.

15,000 shares Idenet, Inc.

20,000 shares Nouveau International, Inc.

10,000 shares Aegis Consumer Funding

50,000 shares Eastwind Group

20,000 shares MetroGolf, Inc.

10,000 A Warrants Ecotyre Technologies, Inc.

9,000 shares QPQ Corp.

All the securities in this list, with the exception of 30,000 shares of Ecotyre Technologies, Inc., were purchased by Klein on or after October 11, 1996. The parties have stipulated that Klein's purchase of the QPQ Corp. stock was unsolicited, and Klein has agreed to dismiss his claim with regard to that stock.

In oral argument, counsel for Oppenheimer attempted to create a factual issue, arguing that there were two (unidentified) para-

graphs in the stipulated facts that establish that Oppenheimer did not execute the stock transactions at issue. In rebuttal, counsel for Klein stated that the stipulations referred to by Oppenheimer's counsel signified that L.T. Lawrence earlier had purchased the stocks from other brokers to put into L.T. Lawrence's own account. When Klein purchased the stocks, Oppenheimer executed the trades by taking the stocks out of L.T. Lawrence's account and putting them into Klein's account. Counsel for Klein is correct. The district court noted that Oppenheimer did execute the stock transactions at issue, stating:

"In paragraph 17 of the stipulated facts, the parties agree that Oppenheimer provided ministerial administrative services to L. T. Lawrence, including: accepting instructions from L. T. Lawrence for the creation of customer account records in Oppenheimer's automated data system; preparing and transmitting confirmations of trades and monthly account statements to L. T. Lawrence and/or its customers; and extending and maintaining margin credit for L. T. Lawrence customers."

Here, the case was tried on a stipulation of facts, which is binding both on the trial court and this court. Neither court can consider additional factual claims by the parties. See *Wentz Equip. Co. v. Missouri Pacific R. R. Co.*, 9 Kan. App. 2d 141, 142, 673 P.2d 1193 (1983), *rev. denied* 235 Kan. 1042 (1984). Nor can the parties on appeal "be heard to suggest that facts were other than as stipulated or that any material fact was omitted." *Columbia Bank for Coop. v. Okeelanta Sugar Coop.*, 52 So. 2d 670, 673 (Fla. 1951). Accordingly, the court can only render judgment warranted by those facts. *C.M. Showroom, Inc. v. Boes*, 23 Kan. App. 2d 647, Syl. ¶ 1, 993 P.2d 793 (1997).

Further, there is no indication in the record that such factual claims were made in the district court, nor was any such claim noted in the district court's memorandum opinion. We agree with the district court that the stipulated facts establish that Oppenheimer did execute the stock transactions at issue. Additionally, if Oppenheimer had not executed the trades at issue, Klein would have no cause of action against Oppenheimer and this nearly 6-year-old case would have been dismissed long ago on that ground.

Oppenheimer had no knowledge or information that these securities were not registered with the State of Kansas at or near the time of the purchases. Oppenheimer had no duty or obligation under the clearing agreement, the New York Stock Exchange (NYSE) and National Association of Securities Dealers (NASD) rules, or applicable law to determine whether these securities were registered with the State of Kansas and, therefore, took no actions to do so.

The district court concluded that, of all the securities purchased by Klein from L.T. Lawrence, only the MetroGolf stock was required by the Kansas Securities Act to be registered. The district court concluded that K.S.A. 17-1262(b) exempts the other securities at issue from registration and on this ground entered summary judgment for Oppenheimer on all the stock purchases except MetroGolf.

Klein seeks to impose civil liability on Oppenheimer under two theories and two provisions of the Kansas Securities Act:

First, he contends that Oppenheimer is liable as an aider and abettor of L.T. Lawrence under K.S.A. 17-1268(a) for selling unregistered securities. K.S.A. 17-1268(a) provides that "[a]ny person, who offers or sells a security in violation of K.S.A. 17-1254 or 17-1255, and amendments thereto . . . is liable to the person buying the security from such person . . . ." K.S.A. 17-1255(a) provides that "[i]t is unlawful for any person to offer or sell any security in this state" unless registered under the Kansas Securities Act or the security or transaction is exempt under K.S.A. 17-1261 or K.S.A. 17-1262 and amendments thereto.

Second, Klein contends that Oppenheimer is liable for materially aiding L.T. Lawrence under K.S.A. 17-1268(b) in selling unregistered securities. 17-1268(b) provides that "every broker-dealer or agent who materially aids in the sale is also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that such nonseller did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."

We first consider if Oppenheimer is liable under K.S.A. 17-1268(a) for aiding and abetting L.T. Lawrence in the sale of unregistered securities.

The district court concluded that Klein's cause of action under an aiding and abetting theory failed. First, the district court found that an aiding and abetting theory could not be applied to an action under 17-1268(a) to impose secondary liability on persons listed in 17-1268(b), *i.e.*, a broker-dealer who materially aids in a sale of unregistered securities. Second, the district court concluded that, even if the aiding and abetting could be applied to an action under 17-1268(a), the stipulated facts in the present case would not support a finding that Oppenheimer was liable as an aider and abettor.

On appeal, Klein relies heavily on *State ex rel. Mays v. Ridenhour*, 248 Kan. 919, 811 P.2d 1220 (1991). *Ridenhour* was a public action brought by the Kansas Securities Commissioner under K.S.A. 17-1266, which authorizes the Commissioner to bring civil actions seeking equitable relief to enforce the Kansas Securities Act. In contrast, the present case is a private action brought by the purchaser of unregistered securities seeking damages, interest, costs, and attorney fees under 17-1268. In the circumstances of *Ridenhour*, this court held that there were six factors to consider in determining whether defendants could be held secondarily liable on an aiding and abetting theory. See 248 Kan. at 936-41.

In *Ames v. Uranus Inc.*, 1993 WL 106896, *11 (D. Kan. unpublished opinion filed March 17, 1993), federal District Judge Lungstrum predicted that "the Kansas courts would hold that there is no cause of action pursuant to 17-1255 and 17-1268(a) for aider-and-abettor liability unless it is expressly provided in 17-1268(b)." The federal court reasoned as follows:

"The United States Supreme Court construed federal statutes similar to the Kansas statutes in question in *Pinter v. Dahl*[, 486 U.S. 622, 100 L. Ed. 2d 658, 108 S. Ct. 2063 (1988),] and found that only securities owners who transfer title to an unregistered security and persons who successfully solicit the purchase of unregistered securities to serve their own financial interests can be liable for sales of unregistered and non-exempt securities. 486 U.S. 622, 647 (1988). Even though *Pinter* did not address secondary liability, other federal courts have applied the case to find that allowing aider-and-abettor liability under the statutes construed in *Pinter* would be inconsistent with the holding of the case. *See, Ackerman v.*

*Schwartz,* 947 F.2d 841, 845 (7th Cir.1991); *Royal American Managers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1017 (2d Cir.1989); *Wilson v. Saintine Exploration & Drilling Corp.,* 872 F.2d 1124, 1127 (2d Cir.1989). The Kansas courts have not yet addressed whether the reasoning set forth in *Pinter* is applicable to private actions pursuant to the Kansas statutes against sellers of unregistered securities.

"The Supreme Court, in *Pinter* construed Section 12(1) of the Securities Act of 1933, which states, in pertinent part: 'Any person who . . . offers or sells a security [in violation of the registration requirements of the Securities Act] shall be liable to the person purchasing such security from him.' 15 U.S.C. § 77l. 'Sale' or 'sell' are defined as 'every contract of sale or disposition of a security or interest in a security, for value.' 15 U.S.C. § 77b(3). 'Offer to sell,' 'offer for sale,' or 'offer' include 'every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value.' These definitions are very close to the definitions in the Kansas statute.

"In *Pinter,* the Supreme Court analyzed the statutes listed above to determine who could be liable as a 'seller' or an 'offeror'. It rejected the Fifth Circuit's approach which defined a seller as one 'whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place.' *Id.* at 648 (quoting *Pharo v. Smith,* 621 F.2d 656, 667 (5th Cir.1980)). The Court believed that the statutory language did not allow such an expansive reading. *Id.* at 650. If this tort doctrine of 'substantial factor' were to be applied to § 12, the Court was concerned that those only remotely associated with the transactions, 'such as accountants and lawyers, whose involvement is only the performance of their professional services,' would be subject to strict liability for violating the statute. *Id.* at 651. Congress intended for the definition of 'seller' to be more narrow because the statute, in § 12(1), only makes a seller liable to one who 'purchases from' that person. *Id.* This language focuses on the relationship between the seller and the purchaser rather than the extent of the defendant's involvement in the transaction itself. *Id.*

"The Kansas Supreme Court rejected the *Pinter* analysis when applied to Kansas' *public* enforcement of K.S.A. § 17-1255 in *Mays v. Ridenhour.* 248 Kan. 919, 811 P.2d 1220 (1991). In *Mays,* the Securities Commissioner of the State of Kansas brought an action against investors in a pyramid investment scheme to compel them to disgorge profits from the scheme. He brought suit against them as sellers of unregistered securities, even though the investors themselves did not actually offer or sell any securities, on the theory that they entered into a civil conspiracy to aid and abet the unlawful sale of securities. *Id.* at 924-25. The Court interpreted the provisions of K.S.A. §§ 17-1255 and 17-1266 (the public enforcement statute applicable to 17-1255) to allow a cause of action by the Commissioner against these defendants on the basis of either a civil conspiracy theory, *id.* at 935, or an aiding and abetting theory. *Id.* at 940.

"The Kansas Supreme Court rejected the *Pinter* narrow definition of 'seller' because of a crucial difference between the Kansas and federal statutes. § 12(1)

of the federal statute states that a seller is liable to the person 'purchasing' the security from him or her. *Pinter* found that Congress' focus on the relationship between the buyer and the seller of the security was significant evidence of its intent to limit the class of sellers liable under § 12(1). *Pinter*, 486 U.S. at 651. In contrast, neither K.S.A. § 17-1255 nor 17-1266 contains similar or equivalent language. Therefore, the Kansas Supreme Court concluded that the Kansas statute contemplated a different approach to defining a 'seller' who could be liable in public enforcement actions for sales of unregistered securities. *Ridenhour*, 248 Kan. at 934. The Court then went on to construe the statute broadly to include civil conspirators and aiders-and-abettors as 'sellers' subject to liability under 17-1266. *Id.* at 935, 940.

"This court believes that the Kansas courts would find the *Pinter* analysis applicable to a *private* action pursuant to K.S.A. § 17-1268 for sales of unregistered securities. The provisions of 17-1266 and 17-1268 have different goals. 'The purpose of 17-1268 is to provide civil liability to allow recovery *by the purchaser,* while 17-1266 is a public cause of action for injury and equitable relief to require accountability by the seller.' *Id.* (emphasis added). In contrast to 17-1266, then, 17-1268 makes a person who sells unregistered securities 'liable to the person buying the security from such person.' K.S.A. 17-1268(a). This language is equivalent to that in § 12(1), construed in *Pinter,* making a seller of unregistered securities liable to one who 'purchases from' that seller. The language of 17-1268, establishing a private cause of action, shows the Kansas legislature's focus on the relationship between the seller and the buyer rather than the extent of the seller's involvement in the transaction. Therefore, the *Pinter* analysis is directly applicable to limit who may be liable as a seller to securities owners who transfer title to an unregistered security and persons who successfully solicit the purchase of unregistered securities to serve their own financial interests. *See, Pinter*, 486 U.S. at 647. Applying the *Pinter* analysis to the Kansas statute, theories of civil conspiracy or aiding-and-abetting would not suffice to make persons who are not sellers or solicitors, as defined by *Pinter,* liable for sales of unregistered securities. This would include attorneys 'whose involvement is only the performance of their professional services.' *Id.* at 651. Therefore, aside from express secondary liability provided under 17-1268(b), there is no secondary liability under 17-1268 for the sale of an unregistered security." 1993 WL 106896 at *11-12.

The district court in the present case also held that there is no secondary liability under 17-1268(a) for the sale of unregistered securities. The district court noted that in *Ridenhour*, the court limited the application of the aiding and abetting theory to 17-1266 actions and expressly excluded 17-1268 actions from its sweep. In this regard, the district court quoted the following passage from *Ridenhour*:

" 'A private cause of action is created in 17-1268(a) by the purchase of a security from one who 'offers or sells' a security in violation of the registration requirements of 17-1254 and -1255 . . . . One who is successful under 17-1268(a) may recover consideration paid for the security, plus 15% interest per annum.

" 'Under K.S.A. 17-1268(b), joint and several liability is imposed upon (1) persons who control a seller liable under subsection (a); (2) partners, officers, and directors of a seller; (3) an employee who materially aids the seller; and (4) a broker-dealer or agent who materially aids the sale . . . .

" 'K.S.A. 17-1268, by its express terms, defines the category of liability for a private cause of action by a purchaser. The limitations of 17-1268(a) and (b), however, do not apply in defining liability under 17-1266 because they have different goals. The purpose of 17-1268 is to provide civil liability to allow recovery by the purchaser, while 17-1266 is a public cause of action for injury and equitable relief to require accountability by the seller.

. . . .

" 'Defendants' argument that the same liability should be imposed under 17-1268 and -1266 is not supported by the language of the statutes. Clearly, the legislature intended to give the Commissioner the ability to seek injunctive and other equitable relief without imposing an increased liability, not only for the profits secured through the involvement in the securities, but also all the damages incurred by the purchaser, interest, and attorney fees. 248 Kan. at 941-42.' "

Hence, the district court in the present case concluded that the aiding and abetting theory of *Ridenhour* "should not be extended to a 17-1268 private action to impose secondary liability on the categories of persons expressly listed in 17-1268(b)." The district court added that its ruling was consistent with the reasoning and analysis of *Ames*.

Klein contends that *Ridenhour* controls a private action under 17-1268(a) as well as a public action under 17-1266. His argument seems to be that the *Ridenhour* analysis regarding sellers is a distinct concept from aiding and abetting and that the two concepts can be applied separately. He seems to advocate applying the *Ridenhour* proximate cause test so that "all that must be established is that the injury flowed directly and proximately from the actions of the person sought to be held liable." 248 Kan. at 940. His thinking, presumably, is that, using the proximate cause test, Oppenheimer can be held liable as a seller without application of the aiding and abetting theory. The premise of his argument, however, is faulty. The proximate cause test in *Ridenhour* is how the aiding

and abetting theory is applied to the facts of the case. See 248 Kan. at 936-38, 940-41.

Klein also contends that the *Ridenhour* analysis should apply to this private action because in *Ridenhour* the court relied on the reported opinions of two private actions, *Mosley v. Unruh*, 150 Kan. 469, 95 P.2d 537 (1939), and *Cook v. Pepco, Inc.*, Blue Sky L. Rep. (CCH) ¶ 72,694 (Okla. Dist. Ct. 1987). In other words, the argument is that, because the court did not distinguish between private and public actions in formulating its decision in *Ridenhour*, the court should not distinguish between private and public actions in the application of the *Ridenhour* test. The argument fails for several reasons. First, all of the court's references in *Ridenhour* to *Mosley* are in the context of its discussion of civil conspiracy rather than the aiding and abetting theory. 248 Kan. at 928-29, 935. Some of the court's references to *Cook* also are in the context of its discussion of civil conspiracy. 248 Kan. at 928-29. Second, and more importantly, the court in *Ridenhour* expressly rejected the argument that the same liability should be imposed under the statutes authorizing private and public actions, stating:

"K.S.A. 17-1268, by its express terms, defines the category of liability for a private cause of action by a purchaser. The limitations of 17-1268(a) and (b), however, do not apply in defining liability under 17-1266 because they have different goals. The purpose of 17-1268 is to provide civil liability to allow recovery by the purchaser, while 17-1266 is a public cause of action for injury and equitable relief to require accountability by the seller.

. . . .

"Defendant's argument that the same liability should be imposed under 17-1268 and -1266 is not supported by the language of the statutes. Clearly, the legislature intended to give the Commissioner the ability to seek injunctive and other equitable relief without imposing an increased liability, not only for the profits secured through the involvement in the securities, but also all the damages incurred by the purchaser, interest, and attorney fees." 248 Kan. at 942.

As this court pointed out, the purpose of 17-1268 is to provide a private recovery by the purchasers, while 17-1266 provides a cause of action requiring public accountability by the seller.

Another of Klein's arguments is that, absent some compelling reason, the term "seller" should not be given different meanings under different sections of the Kansas Securities Act. He contends

that there is no compelling reason why *Ridenhour* should not be extended to 17-1268(a) in order to make the meaning of "seller" under that provision consistent with its meaning under 17-1266. As already noted, in *Ridenhour* the court considered and rejected, as unsupported by the language of the statutes, the argument that the same liability necessarily should be imposed under 17-1268(a) and 17-1266. 248 Kan. at 942.

Finally, Klein disputes "some of the [unidentified] language" in *Ridenhour* and asserts that both 17-1266 and 17-1268(a) serve the same public policy goal of ensuring compliance with the Kansas Securities Act. For this reason, he contends that the definition of "seller" should be the same for both sections. His principal contention with regard to the public policy goal is that the strict liability provision of 17-1268(a) signifies that it was intended to play an important role in enforcement of the Act. It appears that the argument is that the scope of "seller" under 17-1268(a) must be as broad as it is under 17-1266 in order for the former provision to fulfill its intended part in securities regulation.

The arguments raised by Klein ignore this court's intention in *Ridenhour* to treat seller liability more broadly in 17-1266 than in 17-1268(a). The premise of the court's decision in *Ridenhour* was to favor the proximate cause test for a public action over the *Pinter* financial benefit test, which was crafted in a private action. *Pinter v. Dahl*, 486 U.S. 622, 100 L. Ed. 2d 658, 108 S. Ct. 2063 (1988). Klein fails to direct the court to cases from other states broadly interpreting the meaning of "seller" for securities statutes similar to 17-1268(a) that would have supported a change from the direction taken in *Ridenhour*. Oppenheimer asserts that Klein was unable to do so because the great majority of courts that have considered the issue have held that the *Pinter* analysis is appropriate for determining seller liability in a private action. Oppenheimer cites: *Meyers v. Lott*, 133 Idaho 846, 993 P.2d 609 (2000); *Wilson v. Misko*, 244 Neb. 526, 508 N.W.2d 238 (1993); *Biales v. Young*, 315 S.C. 166, 432 S.E.2d 482 (1993); *State v. Williams*, 98 N.C. App. 274, 390 S.E.2d 746 (1990); *Mercer v. Jaffe, Snider, Raitt and Heuer, P.C.*, 713 F. Supp. 1019 (W.D. Mich. 1989); and *Zendell v. Newport Oil Corp.*, 226 N.J. Super 431, 544 A.2d 878 (1988).

None of these cases involves the question of a clearing broker's liability.

In *Meyers*, the Idaho Supreme Court was faced with the question how to define a "seller" of securities under the Idaho Securities Act. It noted that the financial benefit test had been adopted by the United States Supreme Court in *Pinter* and that a broader test had been used by courts in Texas, Washington, and Kansas (*Ridenhour*) in construing their states' securities acts. 133 Idaho at 849. Describing the broader test, the Idaho court stated:

"The substantial factor test is a broad test which allows individuals to be classified as sellers when their acts are deemed to be a substantial factor in bringing about the particular securities violation. The states which have utilized the substantial factor test have been motivated by a desire to protect as many investors as possible." 133 Idaho at 849-50.

The financial benefit test, according to the Idaho court, "defines a seller of securities as one who is motivated by pecuniary gain. This definition extends to 'the person who solicits the purchase, motivated at least in part by desire to serve his own financial interests or those of the securities owner.' *Pinter v. Dahl*, 486 U.S. at 630, 108 S.Ct. at 2070, 100 L.Ed.2d at 671." 133 Idaho at 850. Because it previously had "attempted to maintain uniformity and continuity with the Federal Securities Act and ha[d] utilized federal law in interpreting the Idaho Securities Act," the Idaho court adopted the financial benefit test. 133 Idaho at 850.

The definition of "sale" or "sell" in the Securities Act of Nebraska is like the Kansas Act in including " 'every contract of sale of, contract to sell, or disposition of, a security or interest in a security for value.' " Neb. Rev. Stat. § 8-1101(10) (Reissue 1991), quoted in *Wilson*, 244 Neb. at 534. In *Wilson*, the Nebraska Supreme Court adopted the *Pinter* test in extending seller liability "only to a person who successfully solicits purchase of securities, motivated at least in part by desire to serve his or her own financial interests or those of the securities owner." 244 Neb. at 538. The Nebraska court noted that the state and federal statutory definitions of "sale" and "sell" are "almost identical", 244 Neb. at 534-35, and adopted the *Pinter* test with no discussion of alternatives

except to note that the substantial factor test was rejected in *Pinter*. 244 Neb. at 536-38.

In *Biales*, the Supreme Court of South Carolina followed its Court of Appeals' lead in adopting the *Pinter* test and applying it to the South Carolina Uniform Securities Act:

"We agree the *Pinter* test is consistent with the language of section 35-1-1490 and satisfies the legislative purpose of assuring truth in the sales of securities and a predictable application of liability. We, therefore, adopt the *Pinter* definition of a person 'who offers or sells a security' as applicable to section 35-1-1490." 315 S.C. at 170.

The securities act violation at issue was selling a security by means of misrepresentation. In a footnote, the South Carolina court observed that, even though *Pinter*'s definition of a statutory seller applied only to the provision prohibiting the sale of unregistered securities, the language in the misrepresentation provision was identical to that in the unregistered securities provision and federal courts have applied the *Pinter* standard to the misrepresentation provision. 315 S.C. at 170 n.4.

The North Carolina case cited by Oppenheimer was an appeal from Williams' criminal convictions willfully failing (1) to register a security, (2) to register as a securities dealer or salesman, and (3) to disclose material facts. The North Carolina Court of Appeals overturned the convictions on the ground of insufficient evidence. 98 N.C. App. at 281. Williams, an attorney, drafted articles of incorporation for the corporation with stock at issue. Williams knew at the time of the drafting that the principal had been warned by the Securities and Exchange Commission (SEC) but did not know specifics of the investigation until after the initial meeting of the board of directors. There were 8 equal shareholders in the corporation, including Williams, and all but one, including Williams, attended the initial meeting where officers were elected. Williams was elected secretary-treasurer, and he signed and distributed the stock certificates in his official capacity. The criminal case was based on a $30,000 investment made by Leo Van Leiderkerke and the issuance to him of the stock certificate. Williams had not solicited Van Leiderkerke's participation and had never discussed the purchase of stock with Van Leiderkerke. Although Williams was

aware that the principal had been warned by the SEC, Williams said nothing at the initial meeting about the SEC investigation. Van Leiderkerke testified that he would not have purchased the stock if he had known of the principal's alleged SEC violations. The State cited *Pinter* in support of its prosecution of Williams as a seller. Williams denied that his actions constituted a sale, which is defined in the North Carolina Securities Act as it is in the Kansas Act. There is no mention in the court's opinion of Williams' citing any authority as an alternative to *Pinter*. The Court of Appeals agreed with the defendant that his actions "do not meet the definitional test for a sale as set out in" the state's securities act. 98 N.C. App. at 278. The Court of Appeals rejected the State's broad interpretation of *Pinter*, concluding instead that "*Pinter* states that an *owner* of a security is liable as a seller when the *owner* passes title, or other interest in the security, to the buyer for value." 98 N.C. App. at 279. It also rejected the State's contention that Williams received financial benefit within the meaning of *Pinter* when he accepted his fee for incorporating the company and when his investment was enhanced by Van Leiderkerke's investment. 98 N.C. App. at 279.

In *Mercer*, the federal district court considered a motion by a Detroit law firm to dismiss for failure to state a claim in an action brought by approximately 500 investors who lost money in a securities fraud perpetrated by businesses known as the Diamond entities. It was alleged that members of the law firm actively furthered the Diamond entities' activities, falsely assured state officials that the Diamond entities were in substantial compliance with a consent order, represented to state officials that they had diligently examined the Diamond entities and were satisfied that their practices were truthful and in accordance with applicable law when in fact they knew or were reckless in not knowing that they had not conducted their examination diligently and that the Diamond entities' activities were illegal, and assisted in preparing security offering circulars and approving advertising and promotional materials knowing or recklessly failing to know that the securities promotions were false. Plaintiffs alleged that members of the law firm aided and abetted in violations of the Michigan statute which

provides that any person who unlawfully offers or sells securities "is liable to the person buying the security from him or her." Mich. Comp. Laws Annot. (M.C.L.A.) § 451.810(a) (2005). The Michigan statute at issue corresponds to K.S.A. 17-1268(a). The federal district court held that, under federal, state, and law of the case, investors had no aiding and abetting cause of action under M.C.L.A. § 451.810(a) (based on § 410 of Uniform Securities Act of 1956) against the law firm:

> "The language of section 410(a) tracks that of section 12(2) of the 1933 Securities Act. Courts accordingly apply section 12(2) analysis to section 410(a) claims. *See, e.g., Chelsea Associates v. Rapanos*, 527 F.2d 1266, 1272-73 (6th Cir.1975); *Dept. of Commerce v. DeBeers Diamond Investment, Ltd.*, 89 Mich.App. 406, 280 N.W.2d 547, 550 (1979). As to Count V, the Sixth Circuit has stated that 'an aiding and abetting theory seems inconsistent with the language of § 12(2).' *Davis*, 739 F.2d at 1065. Other courts agree. *See Schlifke*, 866 F.2d at 942 (collecting cases). Finally, this court has specifically held that 'there is no aider and abettor liability under M.C.L.A. § 451.810(a).' [Citation omitted.]" 713 F. Supp. at 1028.

The federal district court also rejected the investors' other secondary liability theory, the "substantial factor" theory, against the law firm under § 410(a). 713 F. Supp. at 1028. The alleged misconduct under this theory consisted of 28 misrepresentations to state officials and participation in preparing and approving offering circulars, advertising, and promotional materials. The basis for rejecting the theory was stated in the following discussion of the investors' federal claims under § 12(2) of the Securities Act of 1933, 15 U.S.C. § 771(2) (2000):

> "In *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 2077-78, 100 L.Ed.2d 658 (1988), the Supreme Court made plain that the section 12 'purchase from' requirement is defined by reference to common usage. If a buyer would commonly think or say that he had 'purchased' securities from someone, such as a vendor or vendor's agent who solicited the sale, then the statutory requirement is met. *Id.* Plaintiffs' Count II allegations fail because, quite obviously, buyers commonly do not say that they purchased securities from lawyers or law firms that helped to prepare promotional material or offering statements. *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1114 (5th Cir.1988), *pet. for cert. filed sub nom. Abell v. Wright, Lindsey & Jennings*, 57 U.S.L.W. 3636 (U.S. March 14, 1989) (No. 88-1518) (summarized at 57 U.S.L.W. 3696).
>
> "The court is aware that *Pinter* expressly involved section 12(1) of the 1933 Act, not section 12(2). Nevertheless, *Pinter* teaches that the primary consideration in

construing the 1933 Act is the plain language of the statute. 108 S.Ct. 2082. The 'purchase from' language of section 12 applies identically to both subsections. Accordingly, despite the fact that section 12(1) imposes strict liability, and 12(2) employs a fault standard, the textual analysis is the same. Every appellate court that has considered the question has determined that *Pinter* applies to section 12(2) claims. *Wilson v. Saintine Exploration and Drilling Corp.*, 872 F.2d 1124, 1126-27 (2nd Cir.1989); *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 940 (7th Cir.1989); *Abell*, 858 F.2d at 1115. The court is confident that the Sixth Circuit will rule likewise.

"Plaintiffs contend that Count II adequately pleads a section 12(2) claim under *Davis v. Avco Financial Services, Inc.*, 739 F.2d 1057 (6th Cir.1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 381 (1985). That case holds that a participant in a securities sale will be deemed an 'offeror' or 'seller' potentially liable under section 12(2) if his or her acts are a 'substantial factor' in bringing about the sale. 739 F.2d at 1065-67. *Pinter*, however, severely criticized the 'substantial factor' test. 108 S.Ct. at 2079-82. Significantly for this case, the *Pinter* Court stated that

'[t]he deficiency of the substantial-factor test is that it divorces the analysis of seller status from any reference to the applicable statutory language and from any examination of § 12 in the context of the total statutory scheme . . . . Indeed, [the test] might expose securities professionals, such as accountants and lawyers, whose involvement is only the performance of their professional services, to § 12(1) strict liability for rescission. The buyer does not, in any meaningful sense, "purchas[e] the security from" such a person.'

*Id.* 108 S.Ct. at 2081, 2082. In light of this criticism, *Davis* is no longer good law." 713 F. Supp. at 1024.

In *Zendell*, the Superior Court of New Jersey held that investors had a negligence claim against the law firm, which had assisted in organizing and presenting for sale limited partnerships in oil and gas exploration, for allowing an offering of unregistered securities. 226 N.J. Super. at 438-39. But the New Jersey court rejected claims against the law firm for liability as a seller of a security. 226 N.J. Super. at 439. In doing so, the court noted that no plaintiff had any contact with a member of the law firm, the law firm was not a general partner in the venture, the law firm never acted as a broker, selling agent, or underwriter, and the law firm had no managerial position with or financial investment in the partnerships. 226 N.J. Super. at 440-41. The New Jersey court's reasoning included a lengthy discussion of and quote from *Pinter*. See 226 N.J. Super. at 439-40.

In contrast to the courts cited by Oppenheimer, the Supreme Court of Washington declined to follow the United States Supreme Court's lead in applying what it calls "a strict privity analysis" of the term "seller" from *Pinter* to alleged violations of the Securities Act of Washington. *Hoffer v. State*, 113 Wash. 2d 148, 150-51, 776 P.2d 963 (1989). According to *Hoffer*, in *Haberman v. WPPSS*, 109 Wash. 2d 107, 744 P.2d 1032 (1987), the Washington court rejected a strict privity test in favor of the substantial factor test. 113 Wash. 2d at 151. After *Pinter* was decided in 1988, defendants in *Hoffer* asked the Washington court to reverse direction and adopt the *Pinter* analysis. The Washington court decided to stay the course. First, noting that *Pinter* involved § 12(1) of the Securities Act of 1933 and that the United States Supreme Court had expressly declined to hold that the *Pinter* test would be applied to § 12(2), the Washington court concluded that it could not predict whether the Supreme Court would extend the test to § 12(2). Thus, the court stated: "It would be imprudent to upset settled law in this state solely on speculation that the Supreme Court might reach a different result under the analogous federal provision." 113 Wash. 2d at 151. As we have learned from the discussions in cases cited by Oppenheimer, federal appellate courts that have considered the question whether the *Pinter* analysis applies to § 12(2) claims have answered in the affirmative.

The Washington court further reasoned that the state securities statute need not be interpreted in accord with the federal statute because the two serve different purposes. "[T]he [Washington Securities Act] has a different purpose than the federal statute, in that it endeavors to protect investors, not just the integrity of the marketplace. Accordingly, our statute is more broadly construed. [Citation omitted.]" 113 Wash. 2d at 152.

Two justices dissented. Justice Pearson, writing for the dissenters, stated:

"I dissent for the reasons given in my dissent in *Haberman* . . . . RCW 21.20.430(1), by its plain language, requires privity of the seller and the person buying the security. My views are reinforced by *Pinter* . . . . As the majority acknowledges, *Pinter* now requires a strict privity analysis of the term 'seller' under section 12(1) of the Securities Act of 1933, 15 U.S.C. § 77l(1).

"The underpinnings of *Haberman* came from lower federal court decisions which are no longer authoritative in light of the *Pinter* ruling. It is an anomaly for the majority to adhere to a 'substantial contributive factor' analysis which has now been discredited by the United States Supreme Court." 113 Wash. 2d at 153 (PEARSON and ANDERSON, JJ., dissenting).

Where there is no factual dispute, as here regarding applicability of an aiding and abetting theory of liability under K.S.A. 17-1268(a), appellate review of an order regarding summary judgment is de novo. *Duarte v. DeBruce Grain, Inc.*, 276 Kan. 598, 602, 78 P.3d 428 (2003).

The legal authorities on this issue favor the court's rejecting Klein's application of an aiding and abetting theory to 17-1268(a). The majority of courts that have considered whether to apply an aiding and abetting theory to statutes similar to 17-1268(a) have declined to do so in light of *Pinter* and the extension by lower courts of the *Pinter* analysis. The only court cited by Klein as rejecting application of *Pinter* to a statute similar to 17-1268(a), the Washington Supreme Court, based its position largely on its state case law that had been established before *Pinter* was decided. In contrast, the established law in this state, *Ridenhour*, although rejecting application of *Pinter* to a public action under 17-1266, indicates an intention to distinguish the analysis for private actions under 17-1268.

In *Ridenhour*, this court limited the application of the aiding and abetting theory to 17-1266 cases and did so noting the different goals and liability of the two statutory provisions. For that reason, we rejected the *Pinter* analysis as to 17-1266 public causes of action. However, 17-1268 creates a private cause of action and the focus is on the relationship of a seller and buyer. A seller of securities, under the financial benefit test, is defined as one who is motivated by pecuniary gain. This includes "the person who successfully solicits the purchase, motivated, at least in part, by a desire to serve his own financial interests or those of the securities owner." *Pinter*, 486 U.S. at 647. Thus, the *Pinter* financial benefit analysis is applicable to a 17-1268(a) private cause of action. The district court correctly concluded that the aiding and abetting theory of *Ridenhour* should not be extended to 17-1268(a) to impose

secondary liability to persons expressly listed in 17-1268(b). Thus, we need not determine if the stipulated facts would support a finding that Oppenheimer is liable as an aider and abettor.

We next consider whether Oppenheimer is liable under K.S.A. 17-1268(b) for "materially aiding" L. T. Lawrence in the sale of unregistered securities.

Subsection (b) of 17-1268, in contrast to subsection (a), expressly provides for secondary liability. Subsection (a) creates liability for "[a]ny person, who offers or sells a security in violation of 17-1254 or 17-1255." Subsection (b) provides that "every broker-dealer . . . who materially aids in the sale is also liable jointly and severally with and to the same extent as the seller."

Broker-dealer. The trial court concluded that Oppenheimer was a broker-dealer within the meaning of the statute. On appeal, Oppenheimer argues that because its services as clearing broker for L.T. Lawrence were merely ministerial, it was not a broker-dealer within the meaning of 17-1268(b). For evidence that its services were purely ministerial, Oppenheimer cites several pages of the stipulated facts, which included the following statement: "L.T. Lawrence and Oppenheimer, at all times pertinent hereto, were registered broker-dealers with the Kansas Department of Securities and were thus authorized to do business as broker-dealers in the State of Kansas." Having stipulated that it is a broker-dealer, Oppenheimer is bound by that admission.

Moreover, the argument Oppenheimer wants to make is not contemplated by the plain language of 17-1268(b). Oppenheimer wants to argue that its *status* is not that of a broker-dealer because it *was not acting* as a broker-dealer in performing services pertinent to the securities at issue. In the wording of the statute, however, the two are separate elements—status includes "every broker-dealer," and the prohibited action is materially aiding an unlawful sale.

Materially aids. The trial court held that Oppenheimer did not materially aid L.T. Lawrence in the sale of unregistered securities. It concluded that "materially aids" means "that the clearing broker exercised some degree of control, influence and participation in the transaction." The trial court found that Oppenheimer did not

solicit or advise Klein and that Oppenheimer performed no more than ministerial, bookkeeping functions. According to the trial court:

"The sum total of Oppenheimer's involvement in the transaction[s] was to provide ministerial administrative services to L.T. Lawrence, including accepting instructions from L.T. Lawrence for the creation of customer account records in its automated data system, preparing and transmitting confirmations of trades and monthly account statements to L.T. Lawrence and its customers, and extending and maintaining margin credit to L.T. Lawrence customers."

The trial court held that those functions were "insufficient to impose secondary liability on Oppenheimer under K.S.A. 17-1268(b)."

The trial court found *Carlson v. Bear, Stearns & Co., Inc.*, 906 F.2d 315 (7th Cir. 1990), to be particularly persuasive, and Oppenheimer relies heavily on it on appeal. At issue in *Carlson* was a clause of Section 13(A) of the Illinois Securities Act that imposes joint and several liability on " 'the issuer, controlling person, underwriter, dealer, or other person by or on behalf of who said sale was made.' " 906 F.3d at 317. Another clause of Section 13(A) imposes liability for participating or aiding in any way in making a sale but expressly restricts liability to "underwriters, dealers and salespersons." 906 F.3d at 317. The federal court concluded that the liability for underwriters, dealers, or salespersons was not applicable to the clearing broker. 906 F.3d at 317. Thus, the federal court considered whether the clearing broker's services were subject to liability under the clause that "covers all persons 'by or on behalf of whom said sale was made,' " 906 F.3d at 317, not under the "aiding in any way" clause. The trial court in the present case mistakenly believed that the broader "aiding in any way" clause was dispositive. With regard to the scope of liability for persons by whom an unlawful sale was made, the federal appellate court stated: "The Illinois Act . . . limits liability to those parties who play integral roles in these transactions. Ministerial or operational duties such as the bookkeeping functions performed by a clearing agent are not such an integral role." 906 F.3d at 319. Predicting how Illinois courts would rule, the federal appellate court concluded that "[p]laintiffs must demonstrate some degree of control,

influence and participation on the part of a clearing agent in order to impose joint and several liability. The actions of Bear, Stearns in these transactions was not of this nature." 906 F.3d at 319.

Since *Carlson* was decided in 1990, it has been cited in only one state court case, *Mars v. Wedbush Morgan Securities, Inc.*, 231 Cal. App. 3d 1608, 283 Cal. Rptr. 238 (1991). *Mars* was an investor's appeal from the trial court's granting the clearing broker's motion for summary judgment. On the claim of negligence, the appellate court cited *Carlson* in characterizing the clearing broker's duties with respect to Mars' account as "operational or ministerial in nature," but the basis for its affirming the trial court's ruling was Mars' failing to present evidence that would create a genuine issue of fact. 231 Cal. App. 3d at 1615.

In his brief, Klein asserts that his research shows that *Carlson* is the only court case that supports Oppenheimer's position. In its brief, Oppenheimer attempts to distinguish a number of cases cited by Klein but cites no cases other than *Carlson* in support of its own position.

K.S.A. 17-1268(b) is based on § 410 of the Uniform Securities Act of 1956, which has been adopted by more than 30 states. Unif. Sec. Act (1956) § 410, 7C U.L.A. 102, 266-67 (2000). State courts, a federal court anticipating state law, and arbitration panels interpreting the language of § 410 and statutes based on it have taken a rather broad view of activities that may constitute "material aid."

In *Hirata Corp. v. J.B. Oxford and Co.*, 193 F.R.D. 589 (S.D. Ind. 2000), a federal trial court anticipated that the Indiana Supreme Court would conclude it was possible that the investor's evidence would establish that the clearing broker "engaged in conduct that 'materially aided' in the introducing broker's violation of the Indiana Securities Code." 193 F.R.D. at 599-600. Thus, the clearing broker's motion to dismiss for failure to state a claim was denied. The federal trial court, unlike the court in *Carlson*, declined to accept conclusory characterizations of the clearing broker's services as dispositive:

"The parties' arguments distilled to their essence involve the extent to which J.B. Oxford was involved in the primary violations committed by Stratton[, the introducing broker]. *Compare* Hirata's Br. at 12 ('Broker-dealers who clear trades

perform far more than just ministerial duties . . . .') *with* Def.'s Memo. at 12 ('A clearing firm . . . performs only ministerial functions for the introducing broker.'). Though J.B. Oxford contends that, as a matter of law, no clearing broker performing typical clearing activities can be held liable, we are of the view that the extent of J.B. Oxford's involvement in Stratton's activities is a factual determination to be resolved on the basis of the parties' evidence." 193 F.R.D. at 600.

In *Prince v. Brydon*, 307 Or. 146, 764 P.2d 1370 (1988), an investor sought to recover losses he suffered from purchasing unregistered securities in a limited partnership. He sued Hansen, the attorney for the limited partnership, for participating or materially aiding in the unlawful sale. The Oregon Supreme Court reversed the trial court's entry of summary judgment in favor of Hansen and reversed the Court of Appeals' affirmance. Hansen's role was described as follows:

"[T]he partnership was formed in 1980 in Idaho to mine and sell barite for the oil industry. Defendant, an Idaho lawyer, was the partnership's attorney and advised it concerning the requirements for private placement of limited partnership units, one of which plaintiff bought in Oregon. 'Defendant drafted the limited partnership agreement and major portions of the offering circular. He also gave an opinion on the tax status of the partnership, which [the partnership] included in the information that it provided prospective investors.' 89 Or. App. at 206. Hansen knew that a partner who lived in Oregon intended to sell units there, but there is disagreement whether he told this partner about the requirements of Oregon Law." 307 Or. at 148.

With regard to liability under the Oregon statutory provision extending liability to one who materially aids in an unlawful sale, the court stated:

"Whether one's assistance in the sale is 'material' does not depend on one's knowledge of the facts that make it unlawful; it depends on the importance of one's personal contribution to the transaction. Typing, reproducing, and delivering sales documents may all be essential to a sale, but they could be performed by anyone; it is a drafter's knowledge, judgment, and assertions reflected in the contents of the documents that are 'material' to the sale." 307 Or. at 149.

It should be noted that the lawyer's exposure to liability depended on a significant difference between Oregon's statute and the Kansas statute. The Oregon court observed:

"The drafters took pains to make clear that the relevant knowledge is of 'the existence of the facts,' not of the unlawfulness of a sale. These provisions may

place upon persons besides a seller's employees or agents who materially aid in an unlawful sale of securities a substantial burden to exonerate themselves from liability for a resulting loss, but this legislative choice was deliberate. The 1967 revision of the Oregon Securities Act substituted, in ORS 59.115(3), the words 'every person who participates or materially aids in the sale' for the words 'every employee of such a seller . . . and every broker-dealer or agent who materially aids in the sale' in section 410(b) of the Uniform Securities Act, on which the revision was based. The possible liability of a lawyer who prepares a prospectus was raised in Senate Judiciary Committee hearings on the revision in the 1965 session, and the witness for the drafters responded that the bill 'makes clear that a person who does not know of a violation is not liable.' The defense against strict liability, in short, was to be a showing of ignorance, not the professional role of the person who renders material aid in the unlawful sale." 307 Or. at 150-51.

In *Foster v. Jesup and Lamont Securities Co.*, 482 So. 2d 1201 (Ala. 1986), the Supreme Court of Alabama answered questions certified by the Eleventh Circuit Court of Appeals. The federal court had determined that the securities firm was not subject to liability under federal securities law for its role in an offering but shifted to the state court the question of liability under the provision of the Alabama Securities Code extending liability to " 'every broker-dealer or agent who materially aids in the sale.' " 482 So. 2d at 1204. The Alabama court affirmatively answered the question whether the securities firm "materially aided" an unlawful securities sale where, even though the buyer did not communicate with the securities firm, its name was displayed prominently on the offering document, the firm's president told the buyer's accountant that the firm was involved, and the buyer relied on the firm's being involved in deciding to purchase an interest. 482 So. 2d at 1204-08. The Alabama court noted that the state law was "considerably broader than § 12 of the Securities Act of 1933." 482 So. 2d at 1206-07. Hence, the Alabama court rejected the firm's argument that its activities must be a "substantial factor" in the sale in order for it to be subject to liability. 482 So. 2d at 1207. In the circumstances of the case before it, the Alabama court concluded that "a jury was justified in finding that Jesup & Lamont materially aided the sale to Foster, and it is, therefore, secondarily liable" under the state securities provision. 482 So. 2d at 1207-08.

Klein relies most heavily on *Koruga v. Fiserv Correspondent Services, Inc.*, 183 F. Supp. 2d 1245 (D. Or. 2001), in which the federal district court confirmed an arbitration award to plaintiffs. The arbitration panel found that Fiserv Correspondent Services, Inc. (Fiserv), a clearing broker, was liable for the fraudulent acts of an introducing broker under the Washington and California Securities Acts' provisions making a broker-dealer who materially aids in a transaction jointly and severally liable with the seller. The plaintiffs' statement of claim alleged that Duke & Company, Inc. (Duke), the introducing broker,

"engaged in fraudulent conduct in connection with the sale of securities to Plaintiffs and other Duke customers, and further that Fiserv, with knowledge of Duke's illegal activity, performed necessary functions related to each of the securities transactions with Plaintiffs, including clearing all transactions, loaning money to Duke customers for the purpose of purchasing Duke stocks on margin, and preparing and mailing all confirmation statements and monthly account statements." 183 F. Supp. 2d at 1246.

Finding that the panel's application of the states' acts "was in accordance with the plain language of the statutes, and not contrary to any other applicable law," the federal district court found no manifest disregard for the law, which is the standard for review of an arbitration decision. 183 F. Supp. 2d at 1247-48. Rejecting Fiserv's argument that the arbitration panel improperly disregarded *Carlson*, the Oregon federal district court stated:

"First, neither this Court nor the arbitration panel is bound by decisional authority from the Seventh Circuit. Second, *Carlson* did not interpret the Washington or California Securities Acts, and the Illinois Securities Act discussed in *Carlson* differs from the Washington and California Acts. The *Carlson* Court did not put forth a per se rule that clearing firms could never be liable because they only perform ministerial duties. The Seventh Circuit expressed concern about extending liability under the Illinois Act to indirect and/or collateral participants and held that the defendant clearing firm performed ministerial duties, and therefore should not be held liable under the Illinois Act. Third, the Seventh Circuit's decision was premised upon the particular facts in that case. The *Carlson* Court found that the defendant performed only ministerial duties in its role as a clearing house for the disputed securities transactions. Unlike *Carlson*, here, the panel made specific factual findings that Fiserv was directly involved in the challenged transaction and materially participated in the wrongdoing." 183 F. Supp. 2d at 1247-48.

Scrutiny of the clearing broker's services identified in *Koruga* and in *Carlson* shows that the clearing broker's activities in *Koruga* may have been somewhat more extensive. In *Carlson*, the court stated that "Bear, Stearns maintained records of the transactions, received payment for securities and delivered certificates, and printed and mailed statements and confirmations of the transactions . . . [and] received a flat fee for each trade." 906 F.2d at 317. In *Koruga*, the court stated that, in addition to the activities specified in *Carlson*, Fiserv cleared all transactions and loaned money to the introducing broker's customers for the purpose of purchasing stocks on margin. 183 F. Supp. at 1246. One would think that the *Carlson* court's description of the clearing broker's receiving payment for securities and delivering certificates is a way of saying Bear, Stearns executed the trades that makes it sound more like bookkeeping than like an essential step in the transaction. If so, the only difference in the descriptions of the services is the loaning of money for margin calls. In the present case, in addition to the Bear, Stearns-type services identified in *Carlson*, Oppenheimer extended and maintained margin credit to L.T. Lawrence customers. The clearing agreement between Oppenheimer and L.T. Lawrence provided that Oppenheimer would extend and maintain margin credit to L.T. Lawrence customers to the extent the transactions required the extension of credit, subject to Oppenheimer's margin policies and applicable margin regulations, and that Oppenheimer would be responsible for calculating margin requirements and initiating margin calls and for the administration of the rehypothecation and lending of securities in customer accounts.

In an amicus brief in *Koruga*, the Securities Industry Association, Inc., argued that the activities of a clearing broker involve processing rather than selling and, thus, are ministerial in nature. See Comment, *Clearer Skies for Investors: Clearing Firm Liability Under the Uniform Securities Act*, 39 San Diego L. Rev. 1327, 1355 (Fall 2002). The author of the Comment takes issue with that characterization:

"However, the processing involved is quite complex, and the execution of transactions and the transfer of title to securities are not simply clerical activities. They require expertise and systems not available to most introducing firms.

"In addition, clearing firms engage in a number of activities that go well beyond simply making the transactions occur. For example, assessments regarding whether to accept an order for processing and when to extend credit involve knowledge and judgment, although the mechanical distribution of monthly statements may not. Decisions regarding whether to execute a transaction in an account after a customer has requested that the clearing firm not execute any further transactions involve judgment. Clearing firms identify an introducing firm's compliance with net capital requirements. As the *Bear, Stearns* SEC action demonstrates, a clearing firm that continues to process transactions with knowledge that the introducing firm is violating the net capital rule is aiding and abetting a violation of federal securities laws. [Bear, Stearns Sec. Corp., Exchange Act Release No. 41,707, 70 SEC No. 710 (Aug. 5, 1999).]

"These activities may be the normal activities of the clearing firm acting in its professional role, but that does not make the activities any less material . . . . [T]he fact that a clearing firm is performing its normal professional responsibilities does not render the duties 'ministerial' and therefore outside of the scope of liability." 39 San Diego L. Rev. at 1356.

The Comment *Clearer Skies for Investors* advocates holding clearing brokers liable for clearing trades for introducing brokers engaged in unlawful activities for four reasons. First, from a clearing broker's position, signs of securities fraud by an introducing broker are apparent. 39 San Diego L. Rev. at 1337. Second, defrauded investors seldom have other recourse because introducing brokerage firms declare bankruptcy, go out of business, or change into some other entity. A 1998 analysis of the SEC's penalty collection showed that only about half of the financial penalties for securities law violations were collected, leaving $2.5 billion uncollected for the previous 13 years. 39 San Diego L. Rev. at 1338. Third, clearing brokers "are in an ideal position to spread the costs of due diligence to their customers—which may be preferable to imposing the cost of noncompliance on the individual victims of securities fraud." 39 San Diego L. Rev. at 1338. And fourth,

"clearing firms benefit financially from the fraud by continuing to process trades for broker-dealers engaged in fraudulent activity. Clearing is an extremely profitable business for large broker-dealers. Clearing firms that continue to extend credit, or fail to report introducing firms after becoming aware that they are not satisfying their net capital requirements legitimately, help those firms stay in business in violation of securities laws. The introducing firms are then able to perpetrate more violations. By keeping the introducing firm in business, the clearing

firm is attempting to salvage its own financial position relative to the introducing firms at the expense of the broker's customers." 39 San Diego L. Rev. at 1339.

In addition to not satisfying net capital requirements legitimately, introducing firms also jeopardize customers' financial interests by other unlawful activities, such as the unregistered sales at issue in the present case.

The trial court in the present case would make the imposition of liability on a clearing broker most unlikely by adding an element that is outside the scope of a clearing broker's typical activities. The trial court expressed the opinion that the strict liability of 17-1268(b) ought to be applied only to broker-dealers that "participat[ed] in persuading the investor to purchase unregistered stock" as well as "exercised some degree of control." In other words, the trial court would require solicitation by an entity that typically does not communicate with an introducing broker's customer until after a sale.

Further, 17-1268(b) lists those persons liable, starting with "[e]very person who directly or indirectly controls a seller liable under subsection (a)" and ending with "and every broker-dealer or agent who materially aids in the sale." If Oppenheimer "exercised some degree of control," it would be liable under the former and not the latter. By the plain language of 17-1268(b), direct or indirect control of the sale is not a factor in determining whether a broker-dealer "materially aids in the sale." The strict liability of such provision is applied to a broker-dealer who materially aids in the sale "unless the nonseller who is liable sustains the burden of proof that such nonseller did not know, and in the exercise of reasonable care could not have known, of the existence of facts by reason of which the liability is alleged to exist." K.S.A. 17-1268(b).

The trial court also noted that the Official Comments to the Uniform Securities Act of 2002, § 509(g)(4), which corresponds to the Uniform Securities Act of 1956, § 410(b) on which 17-1268(b) is based, state that " 'the performance by a clearing broker of the clearing broker's contractual functions—even though necessary to the processing of a transaction—without more would not constitute material aid or result in liability under this subsection.' See, *e.g.*,

*Ross v. Bolton*, 904 F.2d 819 (2d Cir. 1990)." Unif. Sec. Act (2002) § 509, 7C U.L.A. 96-97, cmt. 11 (2005 Supp.). Klein correctly points out that the plaintiffs in *Ross* sought to impose liability on a clearing broker under an aiding and abetting theory rather than under a statutory provision comparable to K.S.A. 17-1268(b). *Ross* is not good authority for the principle for which it is cited.

In discussing whether Oppenheimer could be held liable for materially aiding L.T. Lawrence in the sale of unregistered securities, the trial court cited all the cases from other courts that were discussed in this opinion in Issue 1. None of those decisions involve the concept of "materially aids." The trial court also cited *Katz v. Financial Clearing & Services Corp.*, 794 F. Supp. 88 (S.D.N.Y. 1992), in which a clearing broker's motion to dismiss was granted in part because investors failed to state a claim under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (2000), which provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . .

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Liability under the federal statute differs significantly from liability under K.S.A. 17-1268(b).

Examination of the clearing broker's services in the present case shows that they included activities that required the exercise of professional expertise and judgment and, thus, cannot accurately be called merely clerical or ministerial. In the cases we have examined, where the clearing broker's activities approximate those of Oppenheimer and the statutes are similar to 17-1268(b), liability has been imposed. We find these cases and the San Diego Law Review Comment to be both instructive and persuasive.

As noted above, K.S.A. 17-1268(b) provides for secondary liability of a broker-dealer that materially aids in an unlawful sale "unless the nonseller who is so liable sustains the burden of proof that such nonseller did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Because the trial court concluded that Oppenheimer did not materially aid L.T. Lawrence in the sale of unregistered securities to Klein, it did not reach the question whether Oppenheimer knew, or by the exercise of reasonable care could have known, of the existence of the facts by reason of which the liability is alleged to exist. Nor is this affirmative defense addressed in the parties' briefs. Under the circumstances, however, the affirmative defense should not be deemed waived or abandoned since the trial court found in favor of Oppenheimer and did not reach the issue or make a ruling from which to appeal. The affirmative defense was the subject of argument and an affidavit submitted to the trial court by Oppenheimer in opposition to Klein's motion for summary judgment.

Because we conclude that Oppenheimer materially aided L.T. Lawrence in the sale of unregistered securities to Klein, the question of the affirmative defense will need to be addressed by this court or by the trial court on remand. The parties stipulated that Oppenheimer did not have actual knowledge that the securities at issue were unregistered: "Oppenheimer had no knowledge or information that the securities identified in Paragraph 19 of Plaintiffs' Petition were not registered with the State of Kansas at or near the time of their purchase." Among the stipulated facts that may be pertinent to the question of whether Oppenheimer, in the exercise of reasonable care, could have known of the existence of the facts by reason of which the liability is alleged to exist are the following:

"At the time of the transactions, Oppenheimer had a reasonable belief that L.T. Lawrence, its agents or employees were maintaining compliance and/or supervisory procedures which were adequate to assure compliance by L.T. Lawrence and its registered representatives and employees with all federal and state securities laws, particularly given L.T. Lawrence's legal and contractual obligation to do so under the clearing agreement between Oppenheimer and L.T. Lawrence, the NASD rules, and applicable law.

"Oppenheimer had no duty or obligation under the clearing agreement, the NYSE and NASD rules and applicable law to determine whether these specific securities were registered with the State of Kansas and, therefore, took no actions to do so."

"While the clearing agreement did not require Oppenheimer to review the registration status of securities sold by L.T. Lawrence to its customers, pursuant to paragraph IC Oppenheimer reserved the right to refuse to execute any transactions entered for a customer account."

"Oppenheimer received customer complaints concerning L.T. Lawrence and forwarded the complaints to L.T. Lawrence."

"In his deposition, Gary Emmerich, Oppenheimer's Director of Operations, testified that he personally investigated numerous client complaints of illegal sales against L.T. Lawrence. Emmerich stated that around the end of 1996 or early 1997, he began bringing client complaints about L.T. Lawrence to the attention of the legal department and others at Oppenheimer. Later, Oppenheimer made the decision to ask L.T. Lawrence to find another clearing broker. Emmerich testified that he received investor complaint letters against L.T. Lawrence alleging that L.T. Lawrence was a boiler room operation, that it ordered trades unauthorized by the customer, and committed possible acts of 'churning,' or excessive trading prohibited by rules of the NASD. However, Emmerich never alerted any regulatory authorities about the customer complaints received and stated that he knew of no one at Oppenheimer who made any regulatory filing with the Securities Exchange Commission or alerted authorities."

We do not have enough information in the record to support a determination whether Oppenheimer, in the exercise of reasonable care, could have known of the existence of the facts by reason of which the liability is alleged to exist. We do not know whether there were customer complaints that L.T. Lawrence was selling unregistered securities or whether the customer complaints Oppenheimer received should have been red flags for unlawful practices generally. We do not know what the industry practices were or what would have been involved in Oppenheimer's learning whether L.T. Lawrence was selling unregistered securities. In the absence of sufficient information to make a determination about the exercise of reasonable care, the district court must address this issue on remand.

We next consider whether the securities at issue were exempt from registration.

Based on the stipulated facts, the district court concluded that all of the securities purchased by Klein, with the exception of Me-

trogolf, were exempt under K.S.A. 17-1262(b) from the registration requirements. At the time of the transactions, K.S.A. 17-1262 states that, except as expressly provided in this section, registration requirements do not apply to:

"(b) Any nonissuer distribution by or through a registered broker-dealer of outstanding securities at a price reasonably related to the current market price of such securities, if Moody's manual, Standard & Poor's manual, or any recognized securities manual approved by the commissioner, contains the names of the issuer's officers and directors, a balance sheet of the issuer as of a date within 18 months, and a profit and loss statement for either the fiscal year preceding that date or the most recent year of operations."

This exemption is referred to by the parties as the manual exemption. (It also is called the manual listing exemption.)

The parties' stipulated facts included, for example, the following facts pertaining to Klein's purchase of International Nursing Services, Inc., stock: Klein purchased shares of International Nursing Services, Inc., from L.T. Lawrence in the over-the-counter market on January 20, 1997. Information pertaining to that corporation was published in the August 15, 1996, F-K Volume of Standard & Poor's Corporation Records, including the names of the corporation's officers and directors, a balance sheet of the corporation as of December 31, 1995, and a profit and loss statement as of the same date. On the basis of these stipulated facts, similar stipulations for Klein's other disputed stock purchases (excluding MetroGolf), and stipulations that L.T. Lawrence was a registered broker-dealer and the prices were reasonably related to current market prices, the district court entered summary judgment for Oppenheimer on this issue.

On appeal, Klein concedes that the stipulated facts established that the securities were listed in a securities manual, were sold by a registered broker-dealer, and were sold at market price. Klein, however, challenges the sufficiency of the manual listings and argues that the district court mistakenly assumed that the stipulated facts signified that the listings satisfied statutory requirements. He broadly asserts that some of the profit-and-loss statements and balance sheets are out-of-date. Klein, however, fails to identify which balance sheets and which profit-and-loss statements he is chal-

lenging. Without more information, this court is not obligated to take up this challenge.

Klein also asserts that none of the balance sheets include footnotes. He cites no authority that convinces this court that the absence of footnotes makes the exemption unavailable█

Klein also argues that the stipulations did not establish all the elements of exemptions under K.S.A. 17-1262(b). The burden of proof of an exemption was on Oppenheimer, the party claiming benefit of the exemption. See K.S.A. 17-1272. Klein contends that Oppenheimer did not establish that the securities were sold by L.T. Lawrence in nonissuer distributions. Klein sketches some possible questions about the exemptions and urges this court, on the basis of his intimations, to conclude that Oppenheimer failed to meet its burden of proof. Oppenheimer contends that whether the securities were sold in nonissuer distributions is not at issue in that reasonable inferences drawn from established facts demonstrate that the exemptions apply.

" 'Nonissuer' means not directly or indirectly for the benefit of the issuer." K.S.A. 17-1252(f). The parties' stipulation that L.T. Lawrence executed its purchase of the securities at issue through brokers shows that L.T. Lawrence was not actually the issuer. Thus, Klein's argument would seem to be that the transactions do not fit the definition of nonissuer because L.T. Lawrence's sales of the securities might have been for the benefit of the issuer. Klein argues that there is a substantial likelihood that the securities came from the issuer or an affiliate," thus "mak[ing] the transaction an 'issuer' transaction." See K.S.A. 17-1252(e). Klein's argument is built on the stipulation that "L.T. Lawrence was a market-maker in the securities at issue and acted as a principal in these transactions." "Market-making" is "[t]he practice of establishing prices for over-the-counter securities by reporting bid-and-asked quotations. A broker-dealer engaged in this practice . . . buys and sells securities as a principal for its own account, and thus accepts two-

way bids (both to buy and to sell)." Black's Law Dictionary 990-91 (8th ed. 2004). Klein suggests that L.T. Lawrence may have underwritten "most of the initial public offering of these securities." An "underwriter" is "[o]ne who buys stock from the issuer with an intent to resell it to the public." Black's Law Dictionary 1562 (8th ed. 2004). We do not follow Klein's logic.

Oppenheimer takes the position that L.T. Lawrence's purchasing securities at market price through a broker before reselling them precludes L.T. Lawrence's sales from being for the benefit of the issuer. Oppenheimer's position makes sense, although it is based on a fairly slender thread of evidence of L.T. Lawrence's purchasing the securities at or near market prices. Oppenheimer cites paragraph 17 of the affidavit of Gary Emmerich, executive director of CIBC Oppenheimer, who averred as follows:

> "As a regular course of business, L.T. Lawrence executed the purchase of over the counter ('OTC') securities in which it made a market, including specifically Ecotyre Technologies, Inc., International Nursing Services, Inc., Metrogolf, Eastwind Group, Inc., IndeNet, Inc., Aegis Consumer Funding, Nouveau International, Inc. and QPQ Corp., through brokers other than Oppenheimer. Based upon information and belief, L.T. Lawrence executed the purchase of the securities identified in Paragraph 19 of Plaintiffs' Petition through brokers other than Oppenheimer. These securities were purchased at a price reasonably related to their market price at the time of purchase."

The first sentence of paragraph 17 of Emmerich's affidavit became a stipulated fact. The second sentence, with the based-upon-information-and-belief clause deleted, became a stipulated fact. The last sentence became part of a stipulated fact about Klein's purchases from L.T. Lawrence rather than about L.T. Lawrence's purchases:

> "L.T. Lawrence sold Klein the following securities, among others: (a) 20,000 shares of International Nursing Services, Inc.; (b) 109,400 shares of Ecotyre Technologies, Inc.; (c) 15,000 shares of IndeNet, Inc.; (d) 20,000 shares of Nouveau International, Inc.; (e) 10,000 shares of Aegis Consumer Funding; (f) 50,000 shares of Eastwind Group; (g) 20,000 shares of MetroGolf, Inc.; (h) 10,000 A Warrants of Ecotyre Technologies, Inc.; and (i) 9,000 shares of QPQ Corp. These securities were purchased at a price reasonably related to their market price at the time of purchase."

That the parties did not stipulate that L.T. Lawrence's stock purchases were at or near market prices does not necessarily under-

mine Emmerich's averment. But the combination of vagueness in the key sentence of the affidavit, the antecedent for "[t]hese securities" in the key sentence being securities identified in Klein's petition as ones purchased from L.T. Lawrence, and the same sentence showing up in the stipulated facts referring to securities purchased by Klein from L.T. Lawrence casts some doubt on which purchases were made at market prices. On the other hand, Klein says nothing in his reply brief about Oppenheimer's citing the affidavit, which would lead the court to believe that Klein does not dispute that L.T. Lawrence purchased the securities at market prices.

Oppenheimer also argues that it is established in certain interrogatory answers in the record that L.T. Lawrence's sales were nonissuer transactions. Oppenheimer cites interrogatory responses by two controlling persons from L.T. Lawrence who said that the transactions were exempt under K.S.A. 17-1262(b). According to Oppenheimer, the controlling persons were cognizant of statutory requirements so that their answers were made with the nonissuer element of the exemptions in mind. Interrogatory responses stating that the transactions were exempt state legal conclusions rather than facts.

Klein also contends that Oppenheimer did not establish that the sales to Klein were part of a distribution. With regard to the distribution argument, Oppenheimer contends that it was not raised in the trial court and cannot be raised for the first time on appeal. Examination of the record, however, shows that Klein argued in the trial court that it had not been shown that the sales to him were part of a distribution. On the merits, Oppenheimer cites *In re Peyton D. Prospere*, 1995 WL 561586 (Kan. Sec. Comm. April 7, 1995), in which the Kansas Securities Commissioner stated that for a number of years his staff has viewed the manual listing exemption of K.S.A. 17-1262(b) "as a secondary trading exemption available to any seller reselling outstanding shares already issued, through a broker-dealer registered in Kansas . . . ." The Commissioner continued: "I believe this is the view adopted by most state regulators and the view taken by Professor Louis Loss, the drafter of the Uniform Securities Act, 1956. Loss, Commentary on the Uni-

form Securities Act, p. 70 (1976)." *Prospere*, 1995 WL 561586 at *1. In this case, L.T. Lawrence was reselling outstanding shares already issued and L.T. Lawrence was a broker-dealer registered in Kansas.

Based on the stipulated facts, we conclude, as did the trial court, that all of the securities purchased by Klein, with the exception of MetroGolf, were exempt under K.S.A. 17-1262(b) from the registration requirements.

The final issue is whether the transactions that occurred on and after October 11, 1996, are preempted by the National Securities Markets Improvement Act of 1996, 15 U.S.C. § 78a *et seq.* (2000).

The parties' suggestions on summary judgment included arguments on this issue, but the trial court never reached it because it found Oppenheimer did not "materially aid" in the sale. Since we reverse the trial court on that issue, preemption must be addressed as to MetroGolf, the only stock not exempt from registration under K.S.A. 17-1262(b). Because the record on appeal is insufficient to resolve the issue and there is no trial court decision to review, we decline to consider this issue but direct the district court to do so on remand.

We affirm the trial court's entry of summary judgment on liability under K.S.A. 17-1268(a) and the entry of summary judgment on the exemptions. We reverse the trial court's entry of summary judgment on liability under K.S.A. 17-1268(b) and remand with directions.

Affirmed in part, reversed in part, and remanded with directions.

GERNON, J., not participating.

LARSON, S.J., assigned.